[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON PLAINTIFF'S MARCH 26, 1999, APPLICATION FOR TEMPORARY INJUNCTION
In May of 1783, officers of the Continental Army, having risked their lives, fortunes and honor to win independence for the American colonies, resolved to form a hereditary society to perpetuate "the mutual friendships which have been formed under the pressure of common danger." They prevailed upon George Washington, who had served as commander of the army, and who had not yet assumed his place as first president of the United States, to become the first president general of the new organization. They decided to name it The Society of the Cincinnati[1], creating a General Society which was to be divided into 13 State Societies[2]. They adopted a founding document — The Institution — which set out its structure and the principles upon which the society was based.[3]
The Institution stated that "The following principles shall be immutable and form the basis of the Society of the Cincinnati:
 AN INCESSANT ATTENTION TO PRESERVE INVIOLATE THOSE EXALTED RIGHTS AND LIBERTIES OF HUMAN NATURE, FOR WHICH THEY HAVE FOUGHT AND BLED, AND WITHOUT WHICH THE HIGH RANK OF A RATIONAL BEING IS A CURSE INSTEAD OF A BLESSING.
 AN UNALTERABLE DETERMINATION TO PROMOTE AND CHERISH, BETWEEN RESPECTIVE STATES, THAT UNION AND NATIONAL HONOR SO ESSENTIALLY NECESSARY TO THEIR HAPPINESS, CT Page 15214 AND THE FUTURE DIGNITY OF THE AMERICAN EMPIRE.
 TO RENDER PERMANENT THE CORDIAL AFFECTION SUBSISTING AMONG THE OFFICERS. THIS SPIRIT WILL DICTATE BROTHERLY KINDNESS IN ALL THINGS, AND PARTICULARLY, EXTEND TO THE MOST SUBSTANTIAL ACTS OF BENEFICENCE, ACCORDING TO THE ABILITY OF THE SOCIETY, TOWARDS THOSE OFFICERS AND THEIR FAMILIES, WHO UNFORTUNATELY MAY BE UNDER THE NECESSITY OF RECEIVING IT."
The Institution, anticipating the unhappy probability that on occasion members might be subject to expulsion, included the following clause:
 The State Society will regulate everything respecting itself and the Societies of its districts consistent with the general maxims of the Cincinnati, judge of the qualifications of the members who may be proposed, and expel any member who, by a conduct inconsistent with a gentlemen and a man of honor, or by an opposition to the interest of the community in general, or the Society in particular, may render himself unworthy to continue a member.[4] (Emphasis added.)
In this case, the plaintiff, Robert Ralsey Davenport, a member in good standing of defendant from 1977 until February 15, 1999, having joined in the right of his ancestor, Lieutenant Hezekiah Davenport, challenges his expulsion from defendant. Plaintiff seeks a mandatory injunction, requiring the defendant to reinstate his membership. Defendant opposes the application. The legal and factual issues have been fully and thoughtfully briefed. Lengthy oral argument was held on September 8, 1999. Counsel are commended for the high quality of their written and oral advocacy. Following argument, the parties agreed that the hearing on the application for temporary injunction could be considered as a hearing on the motion for permanent injunction as well.
For the reasons stated, plaintiffs application is denied.
Relevant Facts
The facts relevant to this decision are as follows. An extended discussion of the facts, including various pertinent correspondence, is required to put this decision in context. CT Page 15215
By letter of September 17, 1992, the plaintiff wrote a letter to Philippus Miller V, secretary general of the Society of the Cincinnati. The letter, written on plaintiffs stationery with a Los Angeles return address of 546 Midvale, Suite 8, Mr. Davenport's correct address, stated as follows in relevant part:
Dr. Mr. Miller:
 I am a member of the Society of the Cincinnati in the State of Connecticut, and also the President of the Southern California Chapter of the California Association of the Society of the Cincinnati.
 A number of members here in Southern California have mentioned that it would be a good idea to reprint the 1938 book, Original Members and Other Officers Eligible to the Society of the Cincinnati, by Bryce Metcalf. Copies are virtually impossible to obtain, and then they are in very bad condition, and at very high cost.
 I would be willing to reprint this book, but first I wanted to ascertain that the General Society would have no objections. While the copyright has expired, I feel it is very important to have the approval of the General Society in order to continue on the project. I would of course do a first class job, and I would also ensure that copies would be available for purchase to all members, probably through a short announcement in Cincinnati Fourteen.
 Please let me know if this would be acceptable to the General Society.
Your assistance in this matter is greatly appreciated.
Sincerely,
Robert Davenport
In response, by letter of September 25, 1992, Mr. Miller wrote back to Mr. Davenport at 546 Midvale, Suite 8, as follows on stationery of the Society of the Cincinnati, from its Washington, D.C. headquarters, as follows:
 Dear Mr. Davenport: CT Page 15216
 Thank you for your letter of September 17th requesting permission to reprint Bryce Metcalf's book, Original Members and Other Officers Eligible to the Society of the Cincinnati.
 Over the past few several years several other members of the Society have also sought approval to reprint the book. However, because of the numerous errors and inconsistencies, the Standing Committee voted that the book not be reprinted.
(Emphasis added.)
 However, thank you for taking the time to write, and please do not hesitate to contact me if you have any further questions.
Sincerely,
 Philippus Miller, V Secretary General
There the matter rested for approximately 1-1/2 years.
In March, 1994, Society President General Frederick L. Graham sent a letter to plaintiff again addressing the subject of the Metcalf book. This letter was addressed not to 546 Midvale, Suite 8, but was mistakenly addressed to 654 Midvale, Suite 8. It stated:
March 8, 1994
 Mr. Robert L. Davenport 654 Midvale, Suite 8 Los Angeles, California 90024-2307
Dear Mr. Davenport,
 It has been brought to the attention of the General Society of the Cincinnati that you have plans to reprint Bryce Metcalf's Original Members and other Officers Eligible to the Society of the Cincinnati.
 The Society is also aware of your letter of September 17, 1992 to Secretary General Philippus Miller, V in which you expressed a desire to reprint this work but only if" . . . The General Society would have no objections . . ." because you. . . . feel it is very important to have the approval of CT Page 15217 the General Society . . .". In this regard, the Society also noted the Secretary General's reply of September 25, 1992 in which he advised you that:
 "Over the past few several (sic) years several other members of the Society have also sought approval to reprint the book. However, because of the numerous errors and inconsistencies the Standing Committee voted that the book not be reprinted."
 The Secretary General sent a second letter to you on November 20, 1992 stating again that Metcalf's book would not be reprinted but that ". . . we will keep your name on file with those of other Society members who have offered to do the same."
 Mr. Davenport, the Society of the Cincinnati is unable to comprehend your position in this matter. I repeat that it has been, and is, the position of the General Society that this work not be reprinted. Your sensational advertisement that Bryce Metcalf. . . . documented every other officer of the Continental Army and Navy who was eligible for admission to membership in the society . . ." is simply not true and is misleading. He listed many who are not eligible and missed many who are. This is precisely why the Society does not wish Metcalf reprinted.
 The Society of the Cincinnati again asks that you not reprint Metcalf or, if you have already done so, that the book not be sold or otherwise distributed in any way. . .
 As a member of our "One Society of Friends" I am certain that you will abide by the decision of the General Society of the Cincinnati in these matters as you have said you wished to do.
More than one year and eight months later, by letter of November 20, 1995, Peter W. North, president of defendant, sent another correspondence to plaintiff. This letter read:
Dear Mr. Davenport,
 It has been brought to the attention of the Connecticut Society that you recently had reprinted Original Members and other Officers Eligible to the Society of the Cincinnati by CT Page 15218 Bryce Metcalf.
 Your letter of September 17, 1992 to the General Society indicated a willingness to reprint Metcalf s book, but you felt it would be inappropriate to do so without the approval of the General Society. Subsequently in letters of September 25, and November 20, 1992 the Secretary General indicated that it would not be appropriate to reprint Metcalf's book and gave you reasons for this decision. On November 9, 1993 your father was given special permission to speak at a Connecticut Society Standing Committee Meeting to plead your case for the reprinting of Metcalf's book. You were subsequently informed that the Connecticut Society would defer any approval to the General Society. Finally, the President General sent you a very detailed letter on March 8, 1994 asking that you not reprint Metcalf's book, and again various reasons for not doing so were given. It has been said that your actions were not as a member of our "One Society of Friends".
 The Standing Committee of the Connecticut Society plans to discuss your actions at its next meeting which will probably be no later than February 1996, and at that time appropriate action will be decided on. I thought I would give you an opportunity to explain your actions prior to that meeting.
By letter of May 30, 1996, plaintiff wrote to Warren M. Little, chairman of the history committee of the Massachusetts Society of the Cincinnati.
In relevant part, this letter stated as follows:
Dear Mr. Little:
 I read with great interest in the latest issue of Cincinnati Fourteen that your History Committee is considering publishing a corrected version of Metcalf's Original Members and Other Officers Eligible to the Society of the Cincinnati.
 I believe this is an excellent idea. I tried this several years ago. but at that time the Society was not interested in a corrected version, and as a result I had to reprint the original book without any corrections. (Emphasis added.) CT Page 15219
 I would be interested in obtaining a copy of your "errata sheet" when you have completed documenting the errors in the original Metcalf. It would be my pleasure to reproduce that sheet, at my own expense, and I will insert it in each copy of Metcalf.
 In addition, such an errata sheet would be of great value to those persons who own an original copy of Metcalf (not my reprint). This would allow them, without purchasing a new book, to have a corrected copy of Metcalf.
 Your assistance in this matter is greatly appreciated, and I look forward to your reply.
The record also reveals that plaintiff received correspondence dated September 27, 1996, from the public services librarian at the General Society's Washington, D.C. Anderson House headquarters thanking him for having made a gift of the 1995 reprint of the Metcalf book.
By letter of October 28, 1996, Mr. Little, writing on behalf of the Massachusetts Society's history committee, wrote to Mr. Davenport as follows:
Dear Mr. Davenport:
 Thank you for your letter of July 12, 1996 outlining two proposals for the Society's consideration to dispose of the remaining copies of Metcalf's book which you had reprinted without the permission of the Connecticut or General Society.
 The History Committee reviewed the proposals at its meeting on October 25th in Washington and voted to recommend that the Society take no action on either proposal or consider any further action on the subject. The Standing Committee of the General Society at its meeting on October 26th concurred with this recommendation.
There matters stood until 1998. By correspondence in November and December of 1998, plaintiff was informed that his use of Anderson House continued to be suspended, as it had been over the past year. According to the president general's December 2, 1998 letter to plaintiff, plaintiffs "use of Anderson House was suspended indefinitely because of ungentlemanly conduct in your CT Page 15220 relationship with several members of the House Staff"
In late 1998 the dispute escalated to a new phase when plaintiff was informed by a letter dated December 23, 1998, that a three-member committee — composed of David W. Dumas, chair, Atwood Collins, II and Jay W. Jackson — had been appointed to review reports of plaintiff's conduct that appeared to be inconsistent with further membership in the society. The letter stated that the committee sought plaintiff's response to five allegations before making a recommendation on whether to call for a vote of expulsion pursuant to Article 25 of the bylaws. The letter requested plaintiffs sworn, written comments as to the accuracy of each of the allegations. Each of the five allegations was then set out in a single sentence. Subsequently, defendant proceeded on only two of the allegations, numbers 4 and 5, which alleged as follows:
4. That you caused to be reprinted Bryce Metcalf's OriginalMembers and Other Officers Eligible to the Society of theCincinnati, 1783-1938, including the copyrighted insignia and name of the Society, without authorization from the Society and indeed over its objections.
5. That you were asked to leave Anderson House by then Vice President General Raiford in April 1997 by reason of your treatment of several members of the staff, and that your use of Anderson House was and remains suspended.[5]
An exchange of correspondence ensued.
By letter of January 13, 1999, Jonathan Klein, Esq., counsel to plaintiff, responded to the allegations. Attached to the letter was a sworn affidavit from plaintiff denying and addressing the charges.
As to allegation 4, relating to the Metcalf book, plaintiff in his affidavit asserted that it was "moot". The affidavit stated that:
 This allegation was made a number of years ago by the Connecticut Society to the General Society. At my insistence, it was voted on by both the History Committee and the Standing Committee, and both I and the Connecticut Society were advised that the Society would not consider any further action on the subject. CT Page 15221
By letter of January 14, 1999, the Dumas Committee reported to David Franklin Musto, M.D., President of the Connecticut Society of the Cincinnati. With respect to allegations 4 and 5, the committee stated that it believed the allegations to be "well founded". Concluded the committee:
 As to the fourth, having to do with the unauthorized printing of Metcalf's work, Mr. Davenport offers in his defense only an acknowledgment from Mrs. Ellen Clark of the Anderson House Library, in gracious terms, for a gift of a copy of his reprint, which is no more than one would expect, and a letter from the History Committee declining several of Mr. Davenport's proposals made after the fact. Leaving aside the legal matter of copyright infringement as to the name and insignia, there is no doubt in our minds that Mr. Davenport proceeded with his project after being asked on a number of occasions not to do so.
The committee concluded that Mr. Davenport's conduct as set out in allegations 4 and 5 was "inconsistent with that of a gentleman and a man of honor, and not consistent with membership in "One Society of Friends."'
By letter of January 15, 1999, Dr. Musto communicated the committee's conclusion to plaintiff and further informed him that a Special Meeting to address plaintiffs expulsion would be held at 9:00 a.m. on Monday, February 15, 1999 at the Quinnipiack Club, 221 Church Street in New Haven. Attorney Klein then wrote to Dr. Musto, by letter of January 19, 1999, seeking copies of all documents upon which the committee had relied in reaching its conclusion as well as the Connecticut Society's bylaws. By letter dated January 22, 1999, Mr. Dumas replied to Attorney Klein's January 19, 1999 letter, outlining what documents would be made available to the members on February 15th, and offering to supply Attorney Klein with any documents his client had not provided him. The bylaws were also enclosed. A notice dated January 25, 1999, was sent out, informing the membership that a Special Meeting would be held for the purpose of considering and acting upon the committee's report, in light of Article 25 of the bylaws.
Attorney Klein, in a letter of January 27, 1999, requested certain information from Mr. Dumas. Moreover, in light of the fact that the Society had decided not to seek Mr. Davenport's CT Page 15222 expulsion based on the first three allegations, he requested that, to avoid undue prejudice to his client, all portions of the committee's report relating to these allegations — and Mr. Davenport's responses to them — be redacted from documents to be presented to the members. In a February 5, 1999 response, Mr. Dumas agreed to Attorney Klein's request that references to the first three charges be redacted. Mr. Dumas also informed Attorney Klein that 15 minutes would be allotted for the committee's report; followed by 20 minutes for Mr. Davenport's reply; followed by 5 minutes for the committee to make any follow-up comments. Attorney Klein was also informed that he could accompany Mr. Davenport to the meeting, if Mr. Davenport chose to attend, but that it was expected that Mr. Davenport would make his own presentation.
By correspondence of February 8, 1999, Attorney Klein responded to Mr. Dumas' last letter. In this letter, Attorney Klein stated as follows:
 With respect [sic] one of the documents which you provided to me, specifically, the March 8, 1994 letter from then President General Graham to Mr. Davenport regarding the Metcalf book, you should be aware that Mr. Davenport never received it. The letter was misaddressed and, as the letter from the United States Postal Service in Los Angeles (copy enclosed) attests, one can see how the seemingly minor error in the address could have resulted in the letter not being delivered to Mr. Davenport, as the wrong address is on a different delivery route. The misaddressing of the letter is most unfortunate, as had it been received by Mr. Davenport, the entire course of events might have changed.
On February 15, 1999, the meeting was held at the Quinnipiack Club. In attendance were members of the Connecticut Society, Mr. Davenport, and Attorney Klein.
The meeting began at 9:03 a.m., according to the initial and corrected copies of the transcript, Exhibits R and R-1. Following a blessing and a determination that a quorum was present, plaintiff and Attorney Klein were reminded of the applicable ground rules.
Mr. Dumas noted, among other things, that he did not propose "to get into the question as to whether or not the republication of Metcalf was or was not a good thing" because reasonable people CT Page 15223 could differ on that. Transcript of Special Meeting of February 15, 1999 ("Tr.") at 10. The gist of the committee's recommendation, he continued, was that whether or not one viewed the publication as a good thing, Mr. Davenport was informed on a number of occasions by both the Connecticut Society and the General Society that, "for whatever reasons it chose," the Metcalf book was not to be republished. Nonetheless, continued Mr. Dumas, plaintiff persisted in having the book republished. Tr. at 11. The issue was not one of legalities, but rather "It is whether or not it was consistent with his obligation as a member of one Society of Friends." Tr. at 11.
Mr. Dumas noted that Mr. Davenport contended that he did not receive the comprehensive and emphatic statement from the president general contained in the letter dated March 8, 1994. "It is the feeling of those who sent the letter that he did . . . I think it will come down as is often the case to which version you choose to believe." Tr. at 11-12. Notwithstanding Mr. Davenport's claim that he had not received the March 8, 1994, letter, Mr. Dumas concluded that "it is fair to say looking at the files as a whole that it had been made clear to Mr. Davenport by a number of people on a number of occasions what the wishes of the society were in this regard. And whether or not that particular letter was received does not necessarily undermine the recommendation of the Committee." Tr. at 12.
Mr. Davenport was given an opportunity to speak. After referring to letters of support provided by supporters, including his father — also a member of the society — he read a 6-page statement into the record. The statement, dated February 10, 1999 is appended to this Memorandum of Decision as Attachment 3. In the statement, Mr. Davenport denied all of the allegations against him.
The statement alleged, among other things, that Mr. Davenport was being victimized by false charges by persons including " . . . drug dealers, and persons who have been accused of everything from embezzlement to grand larceny. Members of their gang have even been sent to prison as the result of conviction and felonies. Are these the types of members you want in the Society of the Cincinnati." Tr. at 20. Mr. Davenport stated that the Society would be better served if it investigated the persons making false charges against him, rather than him. Tr. at 20. Mr. Davenport described himself as the target of "nefarious individuals who have infiltrated the Hereditary Society CT Page 15224 Community," Tr. at 21 and who had engaged in a five-year history of persecution and a "campaign of terrorism" against him. Tr. at 21-23.
With specific reference to the Metcalf book allegation, he stated as follows:
 As regards the Metcalf book, it is well known that many persons within the society have wanted this republished, including the history committee of the General Society. This reprinting was a service to the society, and which has still not recouped its cost, being several thousand dollars in the red. A letter from the President General, asking me not to republish it, was sent to the wrong address, and I never received it. In fact, the address was not even on my carriers [sic] mail route. This all occurred six or seven years ago. Four years ago, the Standing Committee of the General Society considered this matter, and now consider it closed. As I understand from a letter of Mr. Peter North, the Connecticut Society itself considered this matter at a Standing Committee meeting three years ago. One would expect that some sort of self-imposed statute of limitations would attach to such matters, to prevent this remaining a topic of consideration well into the next millennium.
When he ran over his allotted time, Mr. Davenport was permitted to read into the record letters from supporters. Although he had been informed he would not be allowed to speak, Attorney Klein was given the opportunity to read into the record a brief statement. Tr. at 37-41. With respect to the Metcalf book, Attorney Klein stated at Tr. 38-39:
 Regarding Mr. Davenport's reprinting of the Metcalf book four years ago, while the evidence shows that the Society did not want it done, the single letter conveying this feeling unambiguously was misaddressed and never received by Mr. Davenport. Had he received the letter, we would not be talking about this today, of the greatest importance to you should be the fact that the History Committee and the Standing Committee of the General Society decided to take no action on the subject in October 1996 and the President of the Connecticut Society, Mr. North, was so informed. That should have been the end of the matter as, after all, this is General Society business, not Connecticut Society business. The General Society reacted to Mr. Davenport's gift of a CT Page 15225 volume of the reprinted book with thanks rather than accusations and outrage.
Mr. Klein went on to make reference to "a mean-spirited personal vendetta against Mr. Davenport by certain individuals," and argued that "it is manifestly unreasonable after all this time to use this as a pretext for expulsion." Tr. at 39.
Following brief responsive remarks by Mr. Dumas, Tr. at 41-45, members posed questions to Mr. Davenport. With respect to the Metcalf book, the following questions and responses were given. Tr. 45-47:
 MR. TOWNSHEND: I would like to ask Mr. Davenport if he was totally unaware that there was opposition to the publication of the book.
 MR. DAVENPORT: The letter from the President General that was sent to me, and was the first thing that was sent to me after my discussions with Mr. Putnam, was misaddressed. I never received it.
 MR. TOWNSHEND: That's not my question. My question is: Were you aware that there was opposition that you obviously had ongoing discussions about the publication of the book?
 MR. DAVENPORT: Right. There was extensive conversations about the publication of the book. And my perception of that was that the Society did — let me see how I can phrase this so it's clear to everybody. I approached the Society about doing a corrected version of the book. It became clear to me that the Society was not interested in correcting the book. And then my subsequent conversation with Mr. Putnam — and I have — I have a copy of the letter I sent to him, confirming that was that. Since they didn't want to do a corrected version, the logical thing was to reprint it exactly the way it was because that book is on microfilm.
 You know, it's something I think that the Connecticut Society should be proud of. Bryce Metcalf is one of the few Connecticut Generals to come out of the Society. I thought this was good in the Society and not something —
MR. DUMAS: Just be responsive to the question. CT Page 15226
 MR. DAVENPORT: Well, the response was what became clear to me was they did not want to help with a corrected version. And therefore, that's why I sent the letter to Mr. Putnam that we should just reprint it as is.
Following more questions and responses, consistent with Robert's Rules of Order, Mr. Davenport was given the opportunity to vote. Mr. Davenport was then instructed to leave the room. The members voted. The result of the vote was 17 to expel, 1 not to expel. Tr. at 54-55.
By letter of February 16, 1999, a copy of which was forwarded to Attorney Klein, the Connecticut Society informed the General Society that as of February 15, 1999, Mr. Davenport was no longer a member of the Society of the Cincinnati in the State of Connecticut. The record reflects no indication that any other member has ever been expelled from defendant.
Legal Discussion
a. Standards Relating to Issuance of Injunctive Relief
A party seeking injunctive relief must ordinarily demonstrate that it is reasonably probable that he or she will be successful on the merits; that there is no adequate remedy at law; that he or she will be irreparably harmed if relief is not granted; and that the balance of equities favors the relief requested. GriffinHospital v. Commission on Hospitals and Health Care,196 Conn. 451, 457-78 (1985). Where, as here, a party seeks a mandatory injunction — "a court order commanding a party to perform an act" — Tomasso Bros., Inc. v. October Twenty-Four, Inc.,230 Conn. 641, 652 (1994), plaintiffs burden is greater. Where a mandatory injunction is sought, the moving party must show "clearly" that he or she is entitled to relief or that "extreme or very serious damage" will result from denial of the injunction. Phillip v. Fairfield University, 118 F. 3rd 131, [118 F.3d 131], 133 (2d Cir. 1997). A mandatory injunction is "an extraordinary remedy granted in the sound discretion of the court and only under compelling circumstances."Simmons v. Budds, 165 Conn. 507, 515 (1973).
b. Freedom of Association as it Relates to PrivateOrganizations
Any discussion of applicable legal principles must begin with CT Page 15227 recognition of the fact that the freedom of persons to associate with others sharing common goals, beliefs, and interests is of a constitutional dimension.[6] Robert v. United States Jaycees,468 U.S. 609, 622 (1984). . . . we have long understood as implicit in the right to engage in activities protected by theFirst Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.") See also Conn. Const., Art. I, Sections 4 and 14. Impediments to the exercise of one's right to choose one's associates "can violate the right of association protected by the First Amendment." Hishon v. King Spalding, 467 U.S. 69, 80 n. 4 (1984). As the United States Supreme Court stated in the Roberts case:
 There can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces a group to accept members it does not desire. Such a regulation may impair the ability of the original members to express only those views that brought them together. Freedom of association therefore plainly presupposes a freedom not to associate. Id. at 623.
As defendant notes, the United States Supreme Court has made reference to two senses in which it recognizes freedom of association. The Court has held "that the Constitution protects against unjustified government interference with an individual's chose to enter into and maintain certain intimate or private relationships." Board of Directors of Rotary International v.Rotary Club, 481 U.S. 537, 544 (1987). The Supreme Court has also upheld the freedom of individuals to associate "for the purpose of engaging in protected speech or religious activities." Id. The instant case principally concerns the first type of associational freedom.
Depending on the attributes of the group or entity under consideration, and the nature of the relationships involved, varying degrees of freedom from government interference are appropriate. Roberts at 620. The family unit, for example, being among the most intimate and involving the most fundamental and private types of issues and decisions, is entitled to a very high level of autonomy. Professional organizations with commercial or business purposes are entitled to less. Roberts at 544-549. In cases involving some form of invidious discrimination or protected classes of persons, a substantial amount of government interference is required to protect society's strong interest in CT Page 15228 promoting equality. In the instant case, there is no claim of invidious discrimination of the sort existing in other cases involving associational freedom. See, e.g., Cross v. MidtownClub, Inc., 33 Conn. Sup. 150 (1976). Cross is clearly distinguishable on its facts, as it involved the exclusion of women from a luncheon club.
There are relatively few recent reported Connecticut decisions addressing the issues raised in this case.[7]
The leading case, upon which both sides rely, is Sterner v.Saugatuck Harbor Yacht Club, 188 Conn. 531 (1982). Sterner was decided pursuant to Connecticut General Statutes Section 33-459, the predecessor to General Statutes Section 33-1056 (a). Section 33-459 required, in relevant part, that membership in nonstock corporations "shall be governed by such rules of admission, retention, withdrawal and expulsion as the bylaws shall prescribe, provided all such bylaws shall be reasonable, germaneto the purpose of the corporation and equally enforced as to allmembers." (Emphasis added.) The language of Section 33-1056 (a) is fundamentally identical.[8]
In Sterner, the plaintiff was expelled from a yacht club when, believing himself blocked, he climbed over the truck of a junior member of the club whose father was a member of the board of governors. Plaintiff was expelled as a consequence. Reversing the trial court's refusal to order plaintiff reinstated, Chief Justice Speziale noted that nonstock corporations have those powers permitted by the nonstock corporation statutes, its certificate of incorporation, and its bylaws. Where a corporation acts in excess of these powers, its acts may be enjoined by a member. Sterner at 535. The reasonableness requirement of Section 33-459, he noted, adopts common law standards of "fair play." Id. at 536. Membership is required by statute to be governed by bylaws that are reasonable. He stated, moreover, that "Bylaws reasonable on their face may not be unreasonably applied." The statutory requirement of reasonable bylaws "requires a hearing that is meaningful and a sanction that is reasonable . . ." Id. at 536. Thus the opinion rejects expulsion for an improper reason, as well as expulsion based on unfair procedures. See, e.g., Pinsker v. Pacific Coast Society of Orthodontists,526 P.2d 253, 259-261 (Supreme Court of California 1974). Chief Justice Speziale concluded that the hearing afforded plaintiff was not meaningful and that the sanction imposed was not reasonable. Although Chief Justice Speziale noted that in ordinary cases CT Page 15229 courts should be reluctant to intervene in the affairs of private clubs, in Sterner, he concluded, reinstatement was warranted.Sterner at 537. Sterner is factually distinguishable from the instant case. In Sterner, a private disagreement was improperly transmuted into yacht club business.
DeBernardo v. Pinewood Lake Association, Inc., 1999 WL 185125 (Superior Court 1999) is the sole case brought to the court's attention decided under Section 33-1056 (a). In DeBernardo, plaintiffs challenged the validity of their expulsion from a defendant lake association, which restricted use of the lake on which plaintiff's cottage was located to association members. The defendant association had adopted a bylaw barring members from living in their cottages between November 1 and April 1; however, the bylaw only applied to some lots and not others. The defendant association was unable to provide a reasonable explanation for the bylaw, beyond the fact that it had always been in effect. Judge Hodgson did not find that explanation convincing, ruling that the challenged bylaw was not germane to the accomplishment of a clearly articulated corporate purpose.
c. Arguments of the Parties, and Application of Facts toControlling Legal Principles.
1. The Claim that the Bylaw is Unreasonable on its FaceBecause the Term "Conduct Inconsistent with a Gentlemen and a Manof Honor" is Undefined and Vague, and Because it Provides for NoRemedy Short of Expulsion.
Plaintiff recognizes that the constitution, rules, and bylaws of an unincorporated association constitute a contract between the members and will be enforced by the courts if not contrary to public policy. 6 Am.Jur.2d, Associations and Clubs, Section 8. Plaintiff argues, however, that Article 25 of the bylaws is unreasonable on its face because the term "conduct inconsistent with a gentlemen and a man of honor" is undefined and vague. The court does not agree.
Many words are susceptible to numerous shades of meaning depending on a wide range of factors. While the term "conduct inconsistent with a gentleman and man of honor" sounds archaic and quaint to the modern ear, that does not mean the words are without meaning. I agree with defendant's argument that many words and phrases from bygone eras — like "due process of law," "cruel and unusual punishment," and "high crimes and CT Page 15230 misdemeanors," all found in the United States Constitution — change over time, while retaining a core meaning. The words "conduct inconsistent with a gentlemen and man of honor" were the words chosen by the originators of the Society of the Cincinnati in 1783 when they established their society. To render these words a nullity simply because they have not been precisely defined, as a lawyer might define a term when negotiating a contract, or a legislator might when drafting a law, would be inappropriate. The words are no more vague than general descriptive terms used everyday in courts, and in ordinary conversation words like rich, or fair, beautiful or sad.
More specifically, the Oxford English Dictionary's 1933 edition contains numerous definitions and uses of the word "gentleman." Its first given definition is: "1. A man of gentle birth, or having the same heraldic status as those of gentle birth; properly, one who is entitled to bear arms, though not ranking among the nobility . . . but also applied to a person of distinction without precise definition of rank. Now chiefly Hist." Its third definition is this: "A man in whom gentle birth is accompanied by appropriate qualities and behavior; hence, in general, a man of chivalrous instincts and fine feelings."
Likewise, the phrase "man of honor," though susceptible to different interpretations, is not unduly vague and ambiguous as used in the bylaws. The first three definitions for "honorable" in The American Heritage Dictionary of the English Language (1969) are as follows: 1. "Deserving or winning honor or respect; creditable; an honorable deed;" 2. Bestowing honor; bringing distinction or recognition; honorable mention; 3. Possessing and characterized by honor: "for Brutus is an honorable man" (Shakespeare). Common synonyms include words like "honored," "revered," "esteemed" and "highly regarded." The Synonym Finder, (Rodale Press Inc. 1978).
Plaintiffs arguments based on the Uniform Code of Military Justice are not persuasive. As plaintiff points out, Title 10 United States Code Section 933 (1970) provides that "Any commissioned officer, cadet, or midshipman who is convicted of conduct unbecoming an officer and a gentlemen shall be punished as a court-marital may direct." Plaintiff points to cases interpreting this statute and applying it to serious misconduct, and to other cases criticizing the language as vague. See, e.g.,Parker v. Levy, 417 U.S. 733 (1974), in which the United States Supreme Court upheld this section, reversing a court of appeals CT Page 15231 ruling, against a challenge on vagueness grounds. Plaintiffs arguments are unpersuasive fundamentally because the language of10 U.S.C. § 933 cannot be compared to the language of a bylaw applicable to a private organization: they operate in entirely different spheres, different legal frameworks, and have different purposes. Moreover, given the military ethos which informs defendant, the members of the society cannot be faulted for having concluded that plaintiff had been insubordinate, and acted dishonorably, by ignoring the stated directive of a committee of the society and reprinting the Metcalf book. There are occasions, of course, when the refusal to conform to the will of the majority is not only not dishonorable, see, e.g., Cross v.Midtown Club, supra, but worthy of admiration. This case, however, involves no great moral principle, or a stirring act of conscience being undertaken by plaintiff.
Likewise, the fact that expulsion is the only penalty available does not render the bylaw unreasonable on its face. It is true that in Sterner, Chief Justice Speziale stated that "The statutory requirement of reasonable bylaws requires a hearing that is meaningful and a sanction that is reasonable. . ."188 Conn. at 536.[9] I do not read this to be a blanket assertion that a bylaw must provide sanctions other than expulsion to avoid being viewed as unreasonable. Rather, I understand Justice Speziale's statement to indicate that a sanction must be reasonable under all circumstances present in a particular case. Clearly, Chief Justice Speziale could not have meant that the bylaws of nonstock corporations must have a graduated set of sanctions to withstand challenge.
2. The Claim that Article 25 Was Not Germane to the Purposesof the Society.
As noted, Section 33-1056 (a) provides, in relevant part, that bylaws governing expulsion shall be "germane to the purposes of the organization." Plaintiff asserts that Article 25 was not germane to the purposes of defendant. See Plaintiffs June 29, 1999 Memorandum of Law at pages 9-11. Plaintiff argues that the purposes of the corporation are strictly limited to those set forth in the special act of the Connecticut General Assembly which constituted the corporation for the purpose of carrying out the three "immutable principles" of the societies. Corporate purposes not stated will not be implied, contends plaintiff, citing Cross v. Midtown Club, Inc., 33 Conn. Sup. 150, 154-55
(1976). CT Page 15232
The logical flaw in plaintiffs argument is that it equates aprinciple actuating a nonprofit organization with a purpose of such an organization, resulting in an unduly narrow view of what defendant's purpose can fairly be said to be. A principle, according to the Webster's Ninth New Collegiate Dictionary, is "a comprehensive and fundamental law, doctrine or assumption." A principle is a precept. A purpose, on the other hand, according to the same dictionary, is "Something set up as an object or an end to be obtained." Principles are not purposes. Determining defendant's purpose or purposes, therefore, requires more than a narrowly circumscribed consideration of its three immutable principles. Notwithstanding the teaching of Cross, given the unique nature of the defendant, and the fact that it was established well before Connecticut's current body of corporate law and statutes was enacted, a reasonable degree of flexibility must be employed when analyzing what defendant's purposes" may be said to be. Unlike certain nonprofit corporations, such as an ambulance corps or a healthcare facility, this one's purpose is not to effectuate a narrow and singular goal.
Moreover, in Section 3.01 of Article III of the bylaws, "Purposes and Principles," Exhibit E, the following is stated: "The purposes and principles of the Society are as set forth in the Institution of the Society of the Cincinnati adopted by the Officers of the American Army at the Cantonment of the American Army on Hudson's River on May 13, 1783."
It is thus necessary to refer to the Institution and other relevant core documents to determine the "purposes" of the society. That the purpose of the General Society — and the state societies, including the Connecticut society — relates to and involves an ongoing evaluation of the genealogy of members and claimed members, and their suitability for membership, cannot be doubted. The societies are generally limited to males who are "lineal and collateral descendants" of officers who served in the Continental Army or Navy during the Revolutionary War. The Institution itself states that each state society shall be the "judge of the qualifications of the members who may be proposed." Article 12 of the bylaws of the Connecticut Society establishes a Committee on Pretensions, which advises the Standing Committee with regard to the eligibility of candidates for membership. Article 12 states that "Upon the death, resignation, retirement or expulsion of a hereditary member, the Committee on Pretensions shall review de novo the eligibility of all claimants for the CT Page 15233 line of his propositus. The Chairman of the committee shall maintain a necrology and report same at the annual meeting."
Article 21 of the defendant's bylaws states, in relevant part, that. . . . in the case of Hereditary and Successor members the agenda must show the applicant's propositus and the specific degree of relationship of the applicant to his propositus." Article 22 outlines in great detail the principles which should guide the Society in evaluating membership. For example, VIII of Article 22 states as follows: "The succession shall descend by primogeniture in the eldest male line so long as it continues unbroken." IX states that "If a line from eldest son to eldest son shall fail of male heirs, the eldest male next in relation to the last surviving son entitled to membership shall be taken and the succession shall descend by primogeniture in that line." X states: "In case of the failure of the male line, the line which descended the greatest number of generations from the original member before a failure of males shall be taken." XI indicates as follows: "The claims of descendants through female lines shall be determined by the same rules of primogeniture as in the case of claims through the male line, so far as applicable." The Metcalf book itself deals with issues of genealogy.
Moreover, as defendant argues, defendant's members could reasonably have believed that one of the "immutable principles" was indeed involved. The third principle states, in relevant part, "TO RENDER PERMANENT THE CORDIAL AFFECTION SUBSISTING AMONGTHE OFFICERS. THIS SPIRIT WILL INDICTATE BROTHERLY KINDNESS INALL THINGS . . ." The preamble to the Institution refers to the newly-formed society as "one SOCIETY OF FRIENDS." It must be recalled that the Institution provides for expulsion of a member who acts in "opposition to the interest of the community in general, or the society in particular . . ." Like any trier of fact, the members had the right to evaluate the credibility of plaintiff s explanations. The members cannot be said to have acted unreasonably in concluding that a "gentleman and man of honor" acting consistent with "the interest of . . . the society" would subordinate his own desires to those of the group, and abide by the groups' decision, expressed in an explicit action taken by a committee of that group.
Consequently, plaintiffs "germaneness" argument fails.
3. The Claim That The Hearing Afforded the Plaintiff Was NotReasonable In A Number of Respects.
CT Page 15234
Plaintiff asserts that the hearing afforded to him was not reasonable in a number of respects. See plaintiffs June 29, 1999 Memorandum of Law in Support of Application for Injunction at pages 15-18. At oral argument on September 7, 1999, plaintiff focused on three specific alleged infirmities: his counsel was permitted to be present, but was told he couldn't speak; he was prevented from objecting to the introduction of evidence; and he was denied the right to confront and cross-examine the witnesses against him.
In essence, plaintiff's objection is that the proceedings were not more like a trial.
If the proceeding were under review were a state-sanctioned civil or criminal proceeding involving state action and directly implicating due process protections, plaintiffs argument would be persuasive. The lack of such fundamental due process protections would render the proceeding flawed. But there is no support for the proposition that an expulsion procedure undertaken by a nonstock corporation must comport precisely with due process guarantees. What plaintiff is entitled to, pursuant to Sterner, is a hearing that is "reasonable." The accused must have notice of the charges, notice of the time and place of the hearing, and a full and fair opportunity to be present and present a defense.Gervasi v. Societa Giusinpi Garibaldi, 96 Conn. 50, 56-58 (1921). It is enough if the procedures adopted are "fair and make for justice rather than form," rather than that there be precise adherence to the forms of legal procedure. Connelly v. MasonicMutual Benefit Association, 96 Conn. 50, 58 (1921). Requiring procedures equivalent to those necessary for trials would convert expulsion hearings into full-fledged adversary proceedings interfering with a private society's fundamental right to manage its own affairs. See Pinsker v. Pacific Coast Society ofOrthodontists, 526 P.2d 253, 259 n. 7 (1974) ("It is important to note that the legal duties imposed on defendant organizations arise from the common law rather than from the Constitution as such . . . the "due process' concept is applicable only in its broadest, non-constitutional connotation . . . we shall refrain from using "due process' language and shall simply refer instead to a requirement of a "fair procedure.')[10]
If counsel for one side is permitted to be actively involved in the hearing, then the other side may feel compelled to retain counsel as well. If formal objections are permitted, then the CT Page 15235 rules of evidence come into play. As the proceeding takes on more and more attributes of a full-blown contested adversary court proceeding, the more complex, time-consuming and costly it becomes. These costs are essential to ensure fairness in a proceeding bearing the imprimatur of the state. However, they are counterproductive to the essential essence of most private organizations and societies.
The question facing the court, then, is whether the procedures used were fundamentally fair. The court concludes they were for the following reasons.
First, the procedural requirements of Article 25 were met. The meeting was duly noticed and the notice contained notice of the action to be taken. More than two-thirds of those present voted to expel. Plaintiff was properly notified of the charges against him, the time and place of the hearing, and given an adequate time to prepare a defense. His counsel asked for, and was provided with all relevant documents requested relating to the Metcalf book. Information relating to the charges which were not pursued was not submitted to the members at the meeting. Mr. Davenport was permitted to submit a sworn statement prior to the hearing. He was allowed to review all of the relevant documents and attend the hearing. He was permitted to address the hearing. His counsel's involvement was severely limited, but Attorney Klein was allowed to briefly address the meeting. Plaintiff was permitted to explain his defense during a brief question and answer period. Under all of the circumstances, the court cannot conclude that the procedures used were unreasonable or unfair as they relate to the charge involving the Metcalf book.
It is true that the role of plaintiffs counsel was severely limited. However, as defendant asserts, there is no principle of law that requires that a member of a fraternal organization be permitted to have legal counsel at an organizational meeting considering expulsion pursuant to its bylaws. The concept of "effective assistance of counsel" derives from theSixth Amendment to the United States Constitution, as defendant notes, and applies to criminal matters, not expulsion proceedings such as the one at issue in this case.
Plaintiffs claim that he was denied the "right" to confront and cross-examine witnesses requires discussion. It is true that the ground rules established did not provide for the calling and examining of witnesses, such as occurs at trial. But this meant CT Page 15236 that the defendant called no witnesses at the hearing. Everything the committee considered was distributed to committee members and defendant. See Defendant's June 29, 1999 Brief, at page 26-27. Plaintiff was permitted to speak and submitted statements from supporters. Moreover, aside from the question of whether plaintiff ever actually received the detailed March 8, 1994 letter, the facts as to the Metcalf book issue were largely undisputed. But cf. Gervasi v. Societa Giusippi Garibaldi,96 Conn. 50, 56 (1921), a case in which a fraternal society expelled a member at a meeting without notice and in which Chief Justice Wheeler stated:
"While the hearing on the charges is in progress, necessarily the accused must have the opportunity of being present and of presenting his defense. And as a rule the charge against the member cannot be substantiated without the testimony of witnesses."
Under all the circumstances, it cannot be said that the procedures used were unfair with regard to the Metcalf book allegation. Plaintiff had the opportunity to make the arguments available to him.
4. Miscellaneous Arguments
Plaintiff raises other arguments that require brief consideration.
First, plaintiff argues that because the incidents underlying the Metcalf book occurred some years ago, they are stale and should not be the basis for his expulsion. The bylaws contain nothing which is the rough equivalent of a statute of limitations. Therefore, the defendant was and should be free to consider relevant offending conduct whenever it chose to do so, and to expel plaintiff;, as long as the bylaws were "reasonable, germane to the purpose of the corporation and equally enforced as to all members," as required by Section 33-1056(a).
Second, the plaintiff claims, in essence, that he considered the matter resolved because he was informed by letter of October 28, 1996, from Warren Masters Little, chairman of the history committee, that the history committee was taking no action on plaintiffs two proposals to dispose of the remaining copies of the Metcalf book, and would not consider any further action on the subject. The fact that plaintiff considered the matter closed CT Page 15237 in his mind did not mean it was closed in the minds of members of the pertinent state societies or the general society. Additionally, the letter refers to the society's decision to take "no action on either [of plaintiffs] proposal[s] or consider any further action on the subject." The "subject" was the disposal of the books, not plaintiffs conduct in having had them reprinted.
Finally, plaintiff argues that the bylaws have not been "equally enforced as to all members." Noting that plaintiff "enjoys the dubious distinction" of being the only member ever expelled from defendant, he relies upon an infamous example of conduct by a member of a state society to support this argument. See Plaintiffs June 29, 1999, Memorandum of Law in Support of Application for Injunction, at pages 19-20. Specifically, he notes that on July 11, 1804, Aaron Burr — then vice president of the United States and a member of the New York Society of the Cincinnati — killed Alexander Hamilton in a duel. At the time, Hamilton was the president general of the General Society, having succeeded George Washington on Washington's death in 1799. Burr was indicted for murder, yet he was not expelled from the New York Society. If Burr was not expelled for killing the president general of the society, Mr. Davenport argues, surely he ought not to be expelled for conduct which, by comparison, is innocuous.
This argument is flawed in at least two important respects, putting aside the tempestuous political environment surrounding that famous incident in American history. First of all, what members view as "conduct inconsistent with a gentleman and a man of honor" in one era may be viewed entirely differently in another. In 1999, dueling with pistols would surely be viewed as unacceptable conduct. But in 1804, the failure or refusal to accept a challenge to duel was in itself widely viewed as dishonorable. Each generation must decide for itself what is acceptable and unacceptable, as long as the core meaning of the bylaw is honored. Secondly, the fact that certain individuals have not been expelled for what is arguably greater offending conduct does not necessarily, as a matter of logic, mean that other individuals ought not to be expelled for less offensive conduct. Providing one example of unpunished conduct, almost two centuries old, does not lead to an inference of unequal enforcement of the bylaws in this particular case. There is no evidence in the record from which it can be concluded that the bylaws have been unequally applied to plaintiff as compared with others. CT Page 15238
Conclusion
Courts must tread lightly when faced with claims of this kind. A substantial amount of deference is owed to members of private nonstock corporations who make decisions of the sort under review here. Judges must avoid the temptation to intrude their own sensibilities into these situations in the absence of a strong, clear need to do so. Berke v. Hecht, 257 Cal. 738, 741
(Cal.App.Dist. 1989) ("Courts must guard against unduly interfering with an organization's autonomy by substituting judicial judgment for that of the organization in an area where the competence of the court does not equal that of the organization.") Such decisions are best made by the persons closest to the situation, and with the most intimate understanding of the niceties of the issues involved, as long as those decisions conform to the legal principles cited above, including statutory requirements. Except in unusual circumstances — or, of course, where the rights of protected categories of persons are involved — members of private societies should be fundamentally free to make their own rules, and associate with those who abide by those rules. The question is not whether someone outside the society, viewing the facts in hindsight, would have come to the same decision. The question, rather, is whether the decision reached by the members of the society, with their common interests, knowledge, sensibilities and goals, was reasonable in light of the facts known to them. In a free society, such decisions are more properly left to private individuals rather than government officials or judicial officers.
This means that there will inevitably be occasions when, from the outside looking in, decisions will be made by private groups and associations that may appear to the uninitiated to be idiosyncratic, petulant or harsh. Private associations who have expelled members will simply have to accept the reality that their actions may be subject to criticism and censure. As Professor Chafee pungently notes in the opening two line of his law review article on the subject, see Endnote 7, "The bitterness of a dispute is apt to be inversely proportional to the area of conflict. Family rows are proverbial for their violence." And, he might have added, for the eccentricities they often reveal to the outside world.
But as Professor Chafee also notes at page 1029 of his article, in light of the high regard society places on the right CT Page 15239 of people to freely associate with like-minded individuals, "Legal supervision must often be withheld for fear that it may do more harm than good."
And as he states, in concluding his article:
 Our reaction toward any particular dispute in a club or trade union or church or college is almost sure to be influenced by our inclination toward one side or the other in this undying controversy. We shall be a bit more favorable to judicial intervention if we believe that the state is the sole ruler of all that goes on within its borders, and is the necessary safeguard of the individual against the closely pressed tyranny of associations. We shall be more doubtful of the probable wisdom of state participation in the affairs of such a group if we are accustomed to think of the state itself as just one more kind of association, which, like the others, should keep to its own functions, and which must be judged according to the value and efficiency of the services it renders in return for rather high annual dues.
Conclusion
Given the circumstances of this case, in consideration of the merits, the court cannot conclude that plaintiff has met his burden of demonstrating that defendant's conduct in expelling him was unreasonable, unfair, or violative of Section 33-1056. Moreover, the balance of equities does not favor granting the relief requested. For all of the reasons stated above, the plaintiffs application for a mandatory injunction restoring his membership in the Society of the Cincinnati in the State of Connecticut is denied.
Douglas S. Lavine Judge, Superior Court